IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHARLES CUMBER
and WILLIAM JACKSON,

      **Plaintiffs,**

vs.                                                No. CIV 04-1134 RB/WDS

**METLIFE and SHIRLEY HOWERY,**
**individually and as a management**
**employee of METLIFE,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant MetLife's Motion for Summary Judgment (Doc. 54), filed on January 6, 2006. Jurisdiction is founded upon 28 U.S.C. § 1331. Having considered the submissions of the parties, relevant law, and being otherwise fully advised, I find that this motion should be denied.

**I.    Facts.**

The following statement of facts is set forth in the light most favorable to Plaintiffs, with all reasonable inferences from the record drawn in their favor. *See Clanton v. Cooper*, 129 F.3d 1147, 1150 (10th Cir. 1997). Plaintiffs, who self-identify as African-American, were employed as financial services representatives ("FSRs") in MetLife's Albuquerque, New Mexico office. (Declaration of Shelly Ledford, Def. Ex. I.) Cumber worked for MetLife from November 1999 until September 12, 2003. (*Id.*) Prior to November 1999, Cumber was employed for five years by an affiliate of MetLife. (*Id.*) Jackson worked for MetLife from April 14, 2001 until September 12, 2003. (*Id.*) The

Albuquerque office was a "detached office" of MetLife's Southwest Financial Group. (Deposition of Charles Cumber, Pl. Ex. C.) Kevin Huckabee, Managing Director of the Southwest Financial Group, supervised the Albuquerque office from the Southwest Financial Group's primary office in El Paso, Texas. (*Id.*) Huckabee was supervised by Harry Axford, Regional Sales Vice President. (Deposition of Harry Axford; Pl. Ex. E.)

Shirley Howery, Operations Manager of the Southwest Financial Group, worked in the El Paso office with Huckabee. (Deposition of Kevin Huckabee Pl. Ex. D.) Howery, who was supervised by Huckabee, was in charge of clerical operations and administrative support staff. (*Id.*) Huckabee and Howery visited the Albuquerque office about once each month. (Cumber Depo.) In addition, Howery spoke with Plaintiffs on the phone a couple of times a month. (*Id.*)

Plaintiffs were the only African-American FSRs in the Albuquerque office during the relevant period. (Deposition of William Jackson, Pl. Ex. B; Cumber Depo.) Strange, an Anglo male FSR, had the most experience as an FSR. (*Id.*) Prior to May 2002, Strange served as the Albuquerque Office Director. (Deposition of Patti Reid, Pl. Ex. G.) In May 2002, Patti Reid was hired as Albuquerque Office Director of the Albuquerque office. (*Id.*) Reid was supervised by Huckabee. (*Id.*)

Maria Lujan worked for Howery as part of the support staff in the El Paso office. (Affidavit of Maria Lujan, Pl. Ex. A.) Lujan heard Howery make racially derogatory comments about African-Americans and Hispanics on "an almost everyday basis." (*Id.*) After Howery returned from a trip to the Albuquerque office, Lujan heard Howery complain to Howery's assistant, Kim, that someone in the Albuquerque office had complained that Howery uttered racially derogatory comments. (*Id.*) Lujan heard Howery tell Kim "I don't like those Northern Niggers." (*Id.*)

2

Howery never uttered a racist remark in Plaintiffs' presence. (Jackson Depo.; Cumber Depo.) However, Howery talked down to Plaintiffs, treated them in a rude manner, acted superior to them, and raised her voice when she talked to them. (Jackson Depo.; Cumber Depo.; Reid Depo.) Howery was supposed to train Jackson, but she stood him up on three or four occasions. (Jackson Depo.) Howery was rude to Plaintiffs if they asked her for help with administrative tasks and she made comments to the effect that Plaintiffs did not belong in the insurance business. (*Id.*)

In addition to the Howery racial slur and condescending attitude, Plaintiffs rely on a remark made by Myrna Ordonez, an auditor from MetLife's Dallas office, to Cumber. (Cumber Depo.) In early 2000, Ordonez visited the Albuquerque office to conduct an audit. (*Id.*) Ordonez called Cumber a "boy" directly to his face in front of two other employees. (*Id.*) Cumber understood the statement to be a racist remark. (*Id.*) Ordonez denied that she intended the remark as racially derogatory, she was reprimanded for the comment, and she never repeated the conduct. (Declaration of Myrna Ordonez, Def. Ex. N.) A MetLife employee warned Cumber when Ordonez planned to return for audits and Cumber managed to avoid Ordonez. (Cumber Depo.)

Plaintiffs do not allege a hostile work environment *per se*; they rely on the racial slurs and Howery's attitude to show that they were denied sales leads on the basis of their race. Distribution of sales leads was vital to FSRs because they worked on commission. (Jackson Depo.) Plaintiffs assert that Howery was responsible for distributing leads to the FSRs and that Howery directed leads away from Plaintiffs and to Strange because of Plaintiffs' race.

MetLife submitted evidence that Huckabee assigned sales leads based on legitimate factors, only a small number of leads were assigned through the El Paso office and that most of Strange's leads came from programs for which Plaintiffs were ineligible. (Huckabee Depo.; Strange Depo.;

3

Declaration of Amir Weiss, Def. Ex. H; Ledford Decl., Declaration of Tom Wesolowski Decl., Def. Ex. J; Declaration of Kevin Huckabee, Def. Ex. K; Declaration of Nadine Vogel, Def. Ex. M.) Huckabee testified in his deposition that he assigned sales leads that came through the El Paso office to individual FSRs based on the relative qualifications, experience levels, and production rates of FSRs, and that Howery was responsible for transmitting the assignment. (Huckabee Depo.) Strange testified in his deposition that Howery was not responsible for communicating leads to FSRs. (Deposition of John Strange, Def. Ex. D.)

Plaintiffs testified in their depositions that Howery distributed all sales leads to FSRs in the Albuquerque office and that she gave most of the leads to Strange. (Jackson Depo.; Cumber Depo.) Cumber testified that Howery distributed most of the leads by email. (Cumber Depo.) Plaintiffs complained about the inequitable distribution of leads to Huckabee, who responded that he had "Shirley (Howery) working on that." (Jackson Depo.; Cumber Depo.) Jackson spoke to Huckabee about the inequitable distribution of leads about ten to fifteen times. (Jackson Depo.)

Reid testified in her deposition that when she asked Huckabee about the inequitable distribution of leads, Huckabee responded that he would look into it. (Reid Depo.) Huckabee was often unavailable because he was out sick with back problems. (*Id.*) When Reid asked Howery for more sales leads for Plaintiffs, Howery responded "I'll give you what I can." (*Id.*) Reid believed that Huckabee gave Howery the authority to distribute sales leads to FSRs. (*Id.*)

Matt Sistrunk, an FSR in the El Paso office, testified in his deposition that Howery had "something to do with lead distribution" and that leads were unfairly distributed. (Sistrunk Depo.; Pl. Ex. H.) During their employment at MetLife, Jackson received about thirty sales leads, and Cumber received about ten. (Jackson Depo.; Cumber Depo.)

Huckabee paired Jackson with Strange to help Jackson increase Jackson's income. (Jackson Depo.; Cumber Depo.; Huckabee Depo.) Jackson worked closely with Strange for three to six months. (Jackson Depo.) During that period, Jackson observed that Strange received thousands of leads. (*Id*.) According to MetLife, most of the leads received by Strange were from programs for which Plaintiffs were ineligible. (*Id*.) However, Jackson observed that Strange's leads originated from a variety of sources, including those for which Plaintiffs were eligible. (Jackson Depo.) Cumber observed that Strange received three or four leads on a daily basis. (Cumber Depo.)

In addition to Cumber and Jackson, two other FSRs, Ketan Patel and Robin Chall, complained to Reid that they did not receive enough leads and that Strange received an inequitable share of leads. (Reid Depo.) None of the complaining FSRs attributed the inequitable lead distribution to racial discrimination. (*Id*.) On one occasion, Huckabee brought a "big box full of leads" to the Albuquerque office and divided them evenly between the FSRs. (Reid Depo.)

Cumber and Jackson submitted resignation letters effective on September 12, 2003. (Cumber Depo.; Jackson Depo.) Cumber testified in his deposition that he submitted his resignation letter about two weeks before the effective date. (*Id*.) In his resignation letter, Cumber stated that he had an opportunity with another company. (*Id*.) Neither letter mentioned discrimination. (*Id*.) Cumber and Jackson had jobs lined up at Allstate when they resigned. (*Id*.)

Reid told Cumber about the racial slur uttered by Howery about six or eight weeks before Cumber resigned. (Cumber Depo.) Shortly thereafter, Lujan told Cumber about the slur and that Howery made other racist comments on a daily basis. (*Id*.) In Cumber's mind, the racial slur established that Howery's actions were based on racial discrimination and tipped the balance in favor of his decision to leave MetLife and go to work for Allstate. (*Id*.)

Jackson testified that, about a week or two before he submitted his resignation letter, Jackson told Reid that he planned to leave because he was unable to make a living at MetLife because Howery would never give him a "fair shake." (Jackson Depo.) Shortly thereafter, or around the time he submitted his resignation letter, Reid told Jackson about Howery's racial slur. (*Id*.) Jackson testified in his deposition that he wanted to escape the discrimination and unfair treatment that he received at MetLife and have the possibility of earning a reasonable salary. (Jackson Depo.)

When Axford learned that Plaintiffs planned to resign, Axford requested a meeting with Plaintiffs in an effort to retain them. (Axford Depo.) In August 2003, Plaintiffs, Huckabee and Axford met for lunch at an Albuquerque restaurant. (*Id*.; Jackson Depo.) Plaintiffs stated that they felt that they were not getting as many leads as Strange. (Axford Depo.) Axford testified in his deposition that Huckabee expressed surprise. (*Id*.) Huckabee testified in his deposition that Plaintiffs said they were leaving because Reid was not helping them and Allstate had offered them more money. (Huckabee Depo.)

Jackson testified in his deposition that he did not tell Axford that he thought that he had been discriminated against. (Jackson Depo.) Cumber testified in his deposition that he told Huckabee about Howery's remark and Huckabee said that he could not believe that Howery would say such a thing. (Cumber Depo.)

Plaintiffs filed timely charges of discrimination with the Equal Employment Opportunity Commission and the New Mexico Human Rights Commission. On October 7, 2004, Plaintiffs filed suit in this court. On January 4, 2005, Plaintiffs filed a First Amended Complaint alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000, *et seq.*, as amended, ("Title VII"), 42 U.S.C. § 1981, and the New Mexico Human Rights Act, NMSA 1978,

6

§28-1-1, et seq. ("NMHRA").

## II. Summary Judgment Standard.

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'" *Munoz v. St. Mary Kirwan Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (quoting Rule 56(c)). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Id.*

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)). The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the non-moving party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter. *See McGarry v. Pitkin Co.*, 175 F.3d 1193, 1201 (10th Cir. 1999).

If the moving party satisfies its initial burden, the party opposing the motion for summary judgment may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing there is a genuine issue for trial as to a dispositive matter for which it carries the burden of proof. *See Munoz,* 221 F.3d at 1164. It is not sufficient "to simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. An issue of material fact is genuine if a reasonable jury could return a verdict for the party opposing the motion. *See Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003). The substantive law at issue determines which facts are material in a given case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

**III.     Discussion.**

Title VII, 42 U.S.C. § 1981, and the NMHRA prohibit employment discrimination on the basis of race. *See* 42 U.S.C. §2000e-2(a)(1); NMSA 1978, § 28-1-7(A); *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) (construing § 1981). Plaintiffs alleging employment discrimination under these statutes may establish intentional discrimination through indirect evidence using the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). *See Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004) (applying *McDonnell Douglas* framework to § 1981 claim); *Sonntag v. Shaw,* 130 N.M. 238, 247, 22 P.3d 1188, 1197 (2001) (applying *McDonnell Douglas* to NMHRA claim).

Plaintiffs have the initial burden of establishing a prima facie case of discrimination or retaliation by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802-804. If the

plaintiffs establish a prima facie case, then the defendant must "articulate some legitimate, nondiscriminatory reason" for the challenged personnel action. *Id.* The plaintiffs then bear the ultimate burden of demonstrating that the defendant's stated reason is, in fact, a pretext for unlawful discrimination. *Id.* at 804. MetLife argues that Plaintiffs are unable to establish a prima facie case because they did not suffer an adverse employment action and that Plaintiffs are unable to demonstrate pretext.

In order to establish a prima facie case, Plaintiffs must produce evidence establishing (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly-situated employees. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005). Plaintiffs' burden of establishing a prima facie case is not onerous. *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). The Tenth Circuit recently described the burden of articulating a prima facie case as "slight." *Orr v. City of Albuquerque*, 417 F.3d at 1149.

Plaintiffs need not show disparate treatment as compared to co-workers outside the protected class. *Sorbo v. United Parcel Service*, 432 F.3d 1169, 1173 (10th Cir. 2005). Plaintiffs are only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant. *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000). The burden "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

MetLife argues that Plaintiffs did not suffer an adverse employment action. The Tenth Circuit liberally construes the term "adverse employment action" and takes a case-by-case approach, examining the "unique factors relevant to the situation at hand." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004). Nevertheless, "a mere inconvenience or an alteration of job responsibilities"

9

does not rise to the level of an adverse employment action. *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998). In order to qualify as adverse, the action must adversely affect the employee's status as an employee, *id.*, 164 F.3d at 533, such as "firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Aquilino v. Univ. of Kansas*, 268 F.3d 930, 934 (10th Cir. 2001).

Plaintiffs rely on the theory of constructive discharge in order to establish the adverse employment action element of their prima facie case.[1] Employees may satisfy the adverse employment action component of the prima facie case by demonstrating that they were constructively discharged. *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005). A constructive discharge occurs when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign. *Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1135 (10th Cir. 2004). Working conditions must be so severe that the plaintiffs simply had no choice but to quit. *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000).

"The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." *Tran v. Trs. of State Colls. of Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004). The voluntariness of an employee's resignation is judged under an objective standard, from the perspective of a reasonable employee. *Exum*, 389 F.3d at 1130.

Plaintiffs assert that they were constructively discharged when the person responsible for assigning sales leads labeled them "Northern Niggers." Construed in the light most favorable to

---

[1] Although not argued by Plaintiffs, the denial of sales leads resulting in reduced income could constitute an adverse employment action. *See Orr v. City of Albuquerque*, 417 F.3d at 1150 (observing that deprivation of compensation qualified as adverse employment action).

Plaintiffs, the record demonstrates questions of fact on the issue of constructive discharge. This is not a case where it is apparent, beyond doubt, that Plaintiffs can prove no facts on their claims that they were effectively forced to resign. Plaintiffs have submitted evidence that Howery had the ability to curtail their income by directing sales leads away from them. When combined with the evidence that Howery harbored racially discriminatory animus towards Plaintiffs, this factor could make Plaintiffs' employment so objectively intolerable that a reasonable individual would feel compelled to resign. Under these circumstances, the constructive discharge claims survive summary judgment and satisfy the adverse employment action element of the prima facie case.

MetLife does not dispute that Plaintiffs are members of a protected class. Plaintiffs have submitted evidence sufficient to create an inference that the adverse treatment was motivated by their race. *See Plotke v. White*, 405 F.3d at 1100. Because they have satisfied all three components of the prima facie case, Plaintiffs have established a prima facie case of employment discrimination.

Once Plaintiffs met their burden of demonstrating a prima facie case, the burden of production shifted to MetLife to demonstrate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802-804; *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003). At step two, the defendant need only advance a facially nondiscriminatory reason for its action against the plaintiff. *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th Cir. 1992). MetLife submitted evidence that Huckabee assigned sales leads based on non-discriminatory factors, that only a small number of leads were assigned through the El Paso office, and that Strange obtained the bulk of his leads directly from programs for which Plaintiffs were ineligible. MetLife has satisfied its production burden of advancing facially nondiscriminatory reasons for the assignment of sales leads.

11

After the defendant satisfies its burden, the plaintiffs are required to proffer evidence that the employer's reason was pretextual. *McDonnell Douglas*, 411 U.S. at 804. "A plaintiff can show pretext by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action such that a reasonable fact finder could rationally find them unworthy of credence." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002). A showing that the employer's justifications for its behavior are pretextual permits a finding of intentional discrimination, but does not compel it. *Reeves*, 530 U.S. at 146-47. MetLife argues that Plaintiffs are unable to demonstrate pretext.

Plaintiffs may establish pretext with evidence that the defendant's stated reasons for the adverse employment action were false. *See Kendrick v. Penske Trans. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). MetLife relies on the premise that Huckabee was responsible for distributing sales leads. Plaintiffs submitted evidence that Huckabee abdicated this responsibility to Howery, who actually determined which FSR received leads. Plaintiffs have submitted evidence that Howery directed sales leads away from them because of their race. MetLife contends that only a faction of the leads came though the El Paso office and Plaintiffs were ineligible for most of Strange's leads. Jackson observed that Strange's leads originated from a variety of sources, including those for which Plaintiffs were eligible. Such inconsistencies support a finding of pretext. *See Kendrick*, 220 F.3d at 1230. Plaintiffs have produced sufficient evidence to show pretext with respect to their claims.

From the evidence considered in the aggregate and construed in the light most favorable to Plaintiffs, a reasonable jury could conclude that MetLife's proffered explanations for the inequitable assignment of sales leads were pretextual. Plaintiffs have submitted sufficient evidence to preclude summary judgment.

**WHEREFORE,**

      **IT IS ORDERED** that Defendant MetLife's Motion for Summary Judgment (Doc. 54), filed on January 6, 2006, is **DENIED**.

*/s/ Robert Brack*

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**